RECEIVED
USDC, CLERK GREENVILLE,

2026 OCT -5 AM 11: 12

**ATTACHMENT A**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

**EDROY "EDDIE" YANCEY, pro se**

Plaintiff,

v.

Case No. 3:26-cv-4448-MGL-MGB

**CIVIC COMPLAINT**
**DEMAND JURY TRIAL**

**BOARD OF TRUSTEES OF THE ALLEN UNIVERSITY** (herein "BOT");
**DR. ERNEST MCNEALEY**, individually, official capacity
**DR. STANLEY J. PRITCHETT, SR**, individually, official capacity
**BISHOP SAMUEL GREEN**, individually, official capacity
**BISHOP JAMES DAVIS**, individually, official capacity
**DR. TONI SIMS MUHAMMAD**, individually, official capacity
**DR. CHARLENE M. SPEAREN**, individually,
**DWEDE DENNIS**, individually, official capacity
**PAULA LOVE**, individually, official capacity
**DANIELLE ROBINSON**, individually, official capacity
**THE AFRICAN METHODIST EPISCOPAL CHURCH, INC.** (herein "AMEC") a Pennsylvania nonprofit corporation;
**THE AFRICAN METHODIST EPISCOPAL CHURCH COUNCIL OF BISHOPS** (herein "Council of Bishops); organization
**THE FOUNDATION OF ALLEN UNIVERSITY** (herein "Foundation"), a South Carolina corporation;
**THE PICKNEY CENTER OPERATIONS**, LLC, (herein "POC") a South Carolina limited liability company;
**WAVERLY HOSPITAL OWNER**, LLC, (herein "Waverly Owner") a South Carolina limited liability company;
**WAVERLY HOSPITAL MM**, LLC, (herein "WHMM") a South Carolina limited liability company;
**WAVERLY HOSPITAL MT**, LLC, (herein "WMT") a South Carolina limited liability company;
**THE VISION CENTER, INC.** (herein "VISION CENTER") a South Carolina nonprofit corporation;
**DOE CORPORATIONS AND BUSINESS ENTITIES** 1-10, and
**JOHN DOES** 1-10,

Defendants,

**ATTACHMENT B**

## CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Edroy "Eddie" Yancey (hereafter "Plaintiff"), appearing pro se, respectfully files this civil action under **Federal Rule of Civil Procedure 3** to redress direct financial, contractual, and professional injuries inflicted upon him individually by Defendants, the Board of Trustees of Allen University and the individually named institutional administrators.

The Plaintiff, a victim of an institutional fraud scheme, asserts that the individual persons entrusted with Allen University's (herein "the University") corporate governance, executive administration, and fiscal assets deliberately abused their authority. The individual Defendants systematically diverted and misappropriated university funds, concealed material financial information, actively prevented meaningful internal investigation, and executed immediate, unlawful employment retaliation against the Plaintiff by terminating his employment when he requested an internal account and structural culpability regarding ongoing wage theft, fraud, breaches of contract, and breaches of fiduciary duty.

The Plaintiff brings these claims strictly in his individual capacity because the persons exercising supreme control over the university infrastructure actively utilized the corporate Enterprise as a vehicle to perpetrate widespread fraud and execute retaliatory acts that directly damaged the Plaintiff's business, property, and career infrastructure.

## PRELIMINARY STATEMENT

**1.** On August 26, 2026, Magistrate Judge Kaymani D. West ruled that the Plaintiff's proposed claims in intervention within the civil action *Montgomery v. Allen University BOT* [3:26-cv-01157 (D.S.C.)] were factually related to his employment with the University, but legally distinct from the specific institutional allegations in that active docket.

**2.** Accordingly, the Court denied the Plaintiff's Motion for Reconsideration to Intervene under Federal Rule of Civil Procedure 24(a)(b), leaving the merits of the Plaintiff's independent claims completely unadjudicated.

**3.** The initiation and filing of this independent civil action was directly necessitated by a convergence of recent procedural events:

**a.** The filing of the First Amended Verified Complaint in *Montgomery v. Allen University BOT* on August 21, 2026;

**b.** The Court's procedural denial of the Plaintiff's intervention motion on August 26, 2026; and

**c.** The federal grand jury wire fraud indictment in *USA v. Lamonica Valrie*, [3:26-cr-00749-CRI-1] on September 15, 2026.

**4.** The pending amended action *Montgomery v. Allen University BOT* serves as material, public evidence that the Defendants' unlawful operational scheme is part of an ongoing, institutionalized pattern of racketeering behavior.

**5.** The *Montgomery v. Allen University BOT* amended complaint is directly relevant because it corroborates that the individual Defendants utilized their overlapping

positions of authority within the University, its Board of Trustees, the Seventh Episcopal District of the African Methodist Episcopal Church ("AMEC"), and the Council of Bishops to prejudicially control the University's affairs, conceal material financial information, and suppress meaningful oversight.

**6.** The Court's August 26, 2026, procedural ruling preserves the Plaintiff's right to bring these claims independently, as the Court did not reach or rule upon the merits of his individual wage theft, breach of contract, RICO, or breach of fiduciary duty claims.

**7.** The federal grand jury indictment on September 15, 2026, in *USA v. Lamonica Valrie* provides vital evidence of open-ended continuity by exposing a multi-million-dollar wire fraud and money laundering scheme executed within the University's leadership and administration during the exact timeline of the Plaintiff's active employment.

**8.** Public criminal disclosures surrounding this federal prosecution reveal a striking nexus: while the Defendants' administrative leadership was actively ignoring the Plaintiff's electronic inquiries regarding missing payroll, they were simultaneously routing unverified, multi-million-dollar electronic transactions out of institutional accounts via interstate wires. Utilizing identical or similar pattern of administrative concealment detailed in the *Montgomery* filing, and the interrelated *USA v. Lamonica Valrie.*

**9.** This systemic operational mismanagement and bad faith diversion of capital directly compromised the institution's liquid cash reserves, driving the continuous straight-time wage withholding, contractual breaches, and benefit premium diversions that ultimately weaponized the complete financial ruin of the Plaintiff.

**10.** As a direct and proximate consequence of the Defendants' racketeering activity and intentional wage deprivation, the Plaintiff's financial estate collapsed, forcing debt

consolidation, the liquidation of his Fidelity 401K, TIAA retirement, personal saving account, the cancellation of his life, automobile, property insurance policies, and his complete vulnerability during a subsequent apartment complex fire which resulted in the uncompensated loss of his property and eventually the removal from his residence.

**11.** The Plaintiff brings this independent civil action to remedy systematic wage theft, ongoing racketeering activity, material breaches of employment agreements, the unlawful withholding of government grant funding, the concealment of third-party donor funds, and intentional breaches of fiduciary duty executed by the Defendants.

**12.** The Plaintiff alleges that the Defendants engaged in a coordinated course of misconduct consisting of continuous straight-time wage violations under federal law, the targeted diversion of financial benefits, and the total non-payment of contractually binding baseline salaries, overload instructional contracts, and concurrent adjunct course agreements taught during overlapping academic terms.

**13.** While the Defendants actively ignored, suppressed, and stonewalled the Plaintiff's repeated electronic communications regarding his missing compensation, the administration was simultaneously entangled in widespread financial mismanagement and unverified multi-million-dollar capital diversions, as exposed by a recent independent federal grand jury indictment and in the *Montgomery* filing.

**14.** The Plaintiff seeks actual, compensatory, and consequential damages, mandatory liquidated damages under federal wage law, threefold (treble) damages and associated fees under federal racketeering statutes, and punitive damages to redress the Defendants' egregious, willful, and malicious institutional misconduct.

## I. INTRODUCTION

**15.** As a direct victim injured by the systemic patterns of institutional misconduct exposed in *Montgomery v. Allen University BOT* and *USA v. Lamonica Valrie*, the Plaintiff brings this independent action to hold the responsible individual administrative leaders personally accountable.

**16.** The Plaintiff alleges that Defendants' multi-year scheme extended beyond general institutional mismanagement, directly inflicting financial and professional injuries upon him personally.

**17.** The specifically named Defendants engaged in fraud, conspiracy, the dissemination of false and defamatory statements, straight-time wage theft, breaches of contract, intentional breaches of fiduciary duty, and the deliberate misuse of corporate mechanisms to execute a retaliatory, wrongful termination against the Plaintiff.

**18.** The Plaintiff's concrete financial injuries occurred concurrently with, and resulted directly from, the operational policies implemented by the individual Defendants through the infrastructure of the corporate Enterprise.

**19.** While serving as an Assistant Professor, the Plaintiff attempted to exercise his contractual and statutory rights to institutional transparency by requesting formal payroll disclosures, raising written concerns regarding irregular financial transactions, and appealing for an impartial internal investigation.

**20.** The Defendants responded to these protected actions not with corporate accountability, but with targeted, swift economic and professional retaliation to force his silence.

**21.** The individual persons whose financial misconduct required internal investigation also had total administrative control over whether that identical misconduct would be investigated, disclosed, or legally corrected.

**22.** This conclusive administrative control allowed the underlying fraud to continue unabated and systematically blocked the Plaintiff from utilizing internal procedures to protect his employment, health insurance premiums, and professional standing.

**23.** Specifically, the Plaintiff requested access to his personnel files, relevant financial records, compliance with the University's operational bylaws, and corrective action concerning payroll misconduct that directly threatened his professional duties.

**24.** Because the Plaintiff persistently maintained his internal investigative and whistleblowing efforts, the named Defendants acted in active concert to silence, discredit, and economically penalize him.

**25.** The Defendants deliberately interfered with his duties as an Assistant Professor, blocked his statutory and contractual access to corporate information, and ultimately executed a retaliatory non-renewal of his employment contract.

**26.** The Defendants initiated this coordinated campaign to remove the Plaintiff from his faculty position, thereby eliminating a critical source of internal oversight that protected their ongoing, fraudulent pattern of racketeering from public, regulatory, and legal exposure.

**27.** The individual Defendants, Board of Trustees ("BOT") Bishop Samuel Green, BOT Bishop James Davis, former President Ernest McNealey, Interim President Dr. Stanley J. Prichett, Sr., Assistant President for Academic Affairs Dr. Toni Sims

Muhammad, former Interim Assistant President Dr. Charlene M. Spearen, Human Resources Director Ms. Dwede Dennis, Assistant Vice President for Fiscal Affairs Ms. Danielle Robinson, and former Fiscal Affairs Chief Officer Ms. Paula Love, acted as the individual **"persons"** directing the affairs of the Enterprise under 18 U.S.C. § 1962(c).

**28.** These individual persons hijacked the operational infrastructure of the University and its Board of Trustees (collectively, the **"RICO Enterprise"**) to enter into a coordinated conspiracy to commit wire fraud, financial mismanagement, and the active obstruction of internal justice.

**29.** These individual Defendants collectively constituted a controlling majority of the University's operational officers and, despite their strict fiduciary responsibilities, utilized the corporate structure of the University as a shield to enable, ratify, and execute a pattern of economic retaliation directly damaging to the Plaintiff's livelihood.

**30.** The survival of the illegal scheme depended entirely on enforcing absolute silence and maintaining strict control over the University's internal governance structure.

**31.** To protect the Enterprise, the individual Defendants executed a pattern of forced silence or abrupt termination targeting both staff and Board members who, like the Plaintiff and the plaintiff in *Montgomery v. Allen University BOT*, were in an operational position to expose the underlying wrongdoing.

**32.** This action arises directly out of this coordinated conspiracy carried out by these influential Defendants, who abused their corporate positions of authority to professionally enrich themselves, conceal capital diversions, and secure unlawful institutional stability at the direct economic cost of the Plaintiff.

**33.** For nearly a decade, these individual Defendants exercised unchecked control over the governance, finances, fundraising activities, and institutional decision-making of the University Enterprise, as further corroborated by federal indictment in *USA v. Lamonica Valrie* and *Montgomery v. Allen University, BOT.*

**34.** Rather than fulfill their legal duties of loyalty, honesty, and care, the Defendants exploited the corporate shell of the University to manipulate institutional processes, conceal systemic misconduct, and misuse funds, directly resulting in the retaliatory elimination of the Plaintiff's employment immediately following his formal grievance of systemic misconduct on March 12, 2026.

**35.** As a faculty member directly victimized by the unlawful acts detailed herein, the Plaintiff initiates this civil action to hold the specific, individual Defendants personally liable, and requests all available compensatory and statutory treble damages for his injuries.

**36.** The racketeering and retaliatory misconduct alleged herein was not confined to an isolated transaction or event but constituted a continuous pattern of behavior mirroring the parallel patterns exposed in *Montgomery* filing.

**37.** These unlawful events occurred over a prolonged, continuous period through interrelated financial transactions, contractual relationships, and corrupted internal governance structures.

**38.** These tainted structures enabled the individual Defendants to maintain continuous control over the University Enterprise while systematically neutralizing internal complainant and executing the targeted financial destruction of the Plaintiff.

**ATTACHMENT C**

## II. JURISDICTION AND VENUE

**39.** This civil action is supplemental to *Montgomery v. Allen University Board of Trustees, et al.,* No. 3:2026cv01157, currently pending before the Honorable Sheria Akins Clarke in the Columbia Division.

**40.** This Court has subject-matter jurisdiction over this action *pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction),* as the claims asserted herein arise under the Constitution and the laws of the United States. Specifically, this action presents federal questions arising under *18 U.S.C. §§ 1961-1968*, the **Racketeer Influenced and Corrupt Organizations Act ("RICO")** and the **Fair Labor Standards Act** *(29 U.S.C. § 201 et seq.).*

**41.** Plaintiff alleges, as set forth more fully herein, that certain Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of an association-in-fact Enterprise through a pattern of racketeering activity affecting interstate commerce and causing injury to the Plaintiff as alleged herein.

**42.** This Court has supplemental jurisdiction over Plaintiff's state-law claims *pursuant to 28 U.S.C. § 1367(a)* because those claims are so related to the federal claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution and arise out of a common nucleus of operative facts.

**43.** Defendants' conduct, as alleged herein, involves an alleged pattern of racketeering activity and related acts of fraud, concealment, breach of fiduciary duty,

and misuse of institutional assets, including conduct affecting federal programs and funds administered through federal agencies.

**44.** Plaintiff's federal and state-law claims arise from an interconnected course of alleged conduct involving the University's governance, assets, donor's funds, financial transactions, contractual relationships, and institutional affairs, together with the alleged concealment, suppression of oversight, and resistance to investigation and corrective action described herein.

**45.** At all relevant times, the activities alleged herein affected interstate commerce through, among other things, interstate communications, financial transactions, electronic communications, and federal grant submission systems.

**46.** The Enterprise described in the First Amended Complaint, *Montgomery v. Allen University BOT*, operated through and in connection with the University, an institution whose activities include financial transactions, donor relationships, and communications across state lines.

**47.** Venue is proper in the United States District Court for the District of South Carolina *pursuant to 28 U.S.C. § 1391(b)(2)* because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District and a substantial part of the property that is the subject of this action, including the University's Waverly-Boeing Institute, is situated within this District.

**48.** Allen University, the University, is located in Columbia, South Carolina, within this District, and the governance, financial, donor, contractual, and institutional activities challenged herein were conducted in substantial part through or in connection with the University and persons exercising authority over its affairs.

**49.** A substantial part of the alleged acts and omissions occurred within this District, including Allen University Board meetings and governance decisions; acts and omissions concerning University assets and financial affairs; the collection, disposition, and alleged diversion of donor funds to the University; transactions involving the Waverly-Boeing Institute; and acts or omissions relating to investigation, disclosure, accounting, oversight, and corrective action.

**50.** The conduct occurring within or directed toward this District also included the negotiations, representations, performance, and subsequent Board proceedings concerning the contractual relationship between the University and 50 Plus 1 Sports LLC (501S) *Montgomery v. Allen University BOT* and *USA v. Lamonica Valrie*, which Plaintiff alleges formed part of the broader course of fraudulent conduct, wire communication, and concealment described herein.

**51.** This Court has personal jurisdiction over Defendants because, as alleged more fully herein, Defendants reside in, conduct or conducted activities in, hold or held positions involving entities located in, transacted business in, or purposefully directed conduct toward South Carolina, and the claims asserted herein arise out of or relate to Defendants' contacts with South Carolina and the conduct alleged herein.

**52.** Accordingly, this Court possesses subject-matter jurisdiction over this action, venue is proper in this District, and this Court possesses personal jurisdiction over Defendants as alleged herein.

**ATTACHMENT D**

## III. THE PARTIES

### A. The Plaintiff

**53.** Plaintiff is an adult citizen and resident of Duncan, Spartanburg County, South Carolina. At all times relevant to this action, Plaintiff was employed as an Assistant Professor at the University, a position from which he suffered direct, individual financial and professional injuries as a result of the unlawful acts alleged herein.

### B. The RICO Enterprise

**54.** The Board of Trustees of Allen University ("BOT") is the governing corporate entity of the University, a private educational institution located at 1530 Harden Street, Columbia, South Carolina 29204. BOT is named herein a Defendant in its capacity as Plaintiff's employer for the state-law contract and statutory retaliation claims, and its corporate infrastructure, along with the University, constitutes the RICO Enterprise under *18 U.S.C. § 1961(4),* whose affairs were hijacked and conducted by the individual Defendants through a pattern of racketeering activity.

### C. The Individual Defendants (The RICO "Persons")

**55.** The individual Defendants named in paragraphs 54 through 82 are sued in their individual capacities under *18 U.S.C. § 1962(c)* for personally directing, participating in, and executing a coordinated scheme of fraud, concealment, and economic retaliation that directly injured the Plaintiff's business and property. Where these individuals acted under the color of their institutional authority, such authority was abused to further the racketeering scheme.

**56.** Defendant Dr. Ernest McNealey is an individual residing in Columbia, South Carolina. Defendant McNealey is the President of the Foundation of Allen University, President of Pinkney Center Operations, LLC, President of Waverly Hospital Owner, President of Waverly Hospital MM, LLC, and President of Waverly Hospital MT, LLC. At all times relevant to the underlying racketeering pattern, Defendant McNealey served as the President of the University and an ex-officio member of Defendant BOT until December 2025.

**57.** Defendant Samuel Green is an individual residing in the State of New York. Defendant Green is a Bishop of the African Methodist Episcopal Church ("AMEC"), a member of the AMEC Council of Bishops, the former Bishop of the AMEC's Seventh Episcopal District, the former Chairman of Defendant BOT, and a former member of the Board of Managers of Pinkney Center Operations, LLC.

**58.** Defendant James Davis is an individual residing in the State of South Carolina. Defendant Davis is a Bishop of the AMEC, a member of the AMEC Council of Bishops, the current Bishop of the AMEC's Seventh Episcopal District, and the current Chairman of Defendant BOT.

**59.** Defendant Dr. Stanley J. Pritchett, Sr. is the Interim President of the University, maintaining an office at 1530 Harden Street, Columbia, South Carolina 29204, who assumed operational control of the Enterprise infrastructure in December 2025.

**60.** Defendant Dr. Toni Sims Muhammad, the University's current Provost and Vice President for Academic Affairs, maintains an office at 1530 Harden Street, Columbia, South Carolina 29204. At all relevant times, Defendant Muhammad acted individually as

a directing agent, managing the financial concealment and executing the Enterprise's retaliatory personnel mechanisms.

**61.** Defendant Dr. Charlene M. Spearen, a faculty member at the University, formerly served as its Provost and Vice President for Academic Affairs. She maintains an office at 1530 Harden Street, Columbia, South Carolina 29204. At all times relevant, Defendant Spearen acted individually as a directing agent and managed the financial concealment of the Enterprise.

**62.** Defendant Dwede Dennis, Director of Human Resources at the University, maintains an office at 1530 Harden Street, Columbia, South Carolina 29204. At all times relevant, Defendant Dennis acted individually, managing the financial concealment and executing the retaliatory personnel mechanisms of the Enterprise.

**63.** Defendant Paula Love, the University's former Vice President for Fiscal Affairs, maintained an office at 1530 Harden Street, Columbia, South Carolina 29204. At all times relevant, Defendant Love acted individually and managed the Enterprise's financial concealment mechanisms.

**64.** Defendant Danielle Robinson is the current Assistant Vice President for Fiscal Affairs at the University, maintaining an office at 1530 Harden Street, Columbia, South Carolina 29204. At all times relevant, Defendant Robinson acted individually, managing the financial concealment and executing the retaliatory personnel mechanisms of the Enterprise.

**D. Institutional Co-Conspirators and Corporate Parent Entities**

**65**. Defendant The African Methodist Episcopal Church, Inc. (herein "Defendant AMEC") is a corporate religious organization operating through regional administrative divisions, including the Seventh Episcopal District encompassing South Carolina. Defendant AMEC is named herein because it acted as a corporate supervisor and joint venture partner with the University Enterprise, maintaining a direct financial and organizational relationship through which corporate assets and faculty fundraising were managed and monitored.

**66.** At all times relevant, members of Defendant BOT, Samuel Green and James Davis acted as authorized corporate agents, executives, and Bishops of Defendant AMEC. Through this corporate structure, Defendants Green and Davis were successively granted absolute administrative chairmanships over the Allen University Board of Trustees ("BOT"), blending the financial operations of the church district with the University Enterprise.

**67.** Defendant AMEC was a primary named defendant in federal racketeering and breach of fiduciary duty litigation brought to recover over $90 million in misappropriated assets, In re: AME Church Employee Retirement Fund Litigation, No. 1:22-md-03035-STA-jay (W.D. Tenn.) (herein the "Retirement Plan Litigation"). This prior litigation is directly relevant to establish Defendant AMEC's specific institutional knowledge, intent, and prior notice regarding systemic financial fraud and oversight failures executed by its direct agents, including Defendants Green and Davis, as herein the *Montgomery* filing.

**68.** Plaintiff alleges that Defendant AMEC possessed corporate authority, structural mechanisms, and explicit fiduciary duties to oversee its agents and protect employees within its operational network. Despite receiving formal notice of serious secular

financial fraud, contract manipulation, and whistleblower retaliation occurring within the University Enterprise, Defendant AMEC knowingly failed to investigate or halt the misconduct. This corporate inaction directly enabled the individual Defendants to continue using the Enterprise infrastructure to execute the retaliatory termination of the Plaintiff.

**69.** Defendant African Methodist Episcopal Church Council of Bishops (herein "Defendant Council of Bishops") is an executive governing board composed of the active directors and Bishops of Defendant AMEC. At all times relevant, Defendants Green and Davis were active members of this executive governing board (*BOT*).

**70.** Defendant Council of Bishops was also a primary named defendant in the aforementioned Retirement Plan Litigation (No. 1:22-md-03035-STA-jay), alongside Defendants Green and Davis. This involvement provides the Council of Bishops with specific, documented institutional notice regarding the ongoing financial fraud patterns of its board members and administrative leadership.

**71.** Despite possessing clear corporate oversight mechanisms and receiving written notice regarding the secular financial misconduct, wage theft, and administrative retaliation targeting the Plaintiff at the University, the Defendant Council of Bishops failed to execute its oversight duties. This deliberate indifference directly permitted Defendant Davis to retain his executive position on the Allen University *BOT*, where he actively participated in the coordinated silencing and retaliatory non-renewal of the Plaintiff's employment contract.

**E. The Fraudulent Corporate Shells (The RICO Enterprise Vehicles)**

**72.** Defendant Vision Center is a nonprofit corporate entity organized under the laws of South Carolina. Defendant Samuel Green incorporated Vision Center and served as its President, and Defendant James Davis subsequently succeeded him as President.

**73.** Plaintiff alleges that Vision Center was actively utilized by the individual Defendants as a fraudulent funnel to intercept, retain, and misappropriate charitable assets, grants, and funds explicitly assessed and solicited for the benefit of the University's academic operations.

**74.** Individual Defendants of the BOT, Green and former President Ernest McNealey further utilized the infrastructure of Vision Center to solicit unauthorized financial investments and kickbacks from outside project developers, including the university's development partner, "501S" (*Montgomery v. Allen University BOT*) and (*USA v. Lamonica Valrie*), concurrently with schemes to manipulate university contracts and academic funds. Plaintiff's internal opposition to these interlocking financial diversions directly triggered the Defendants' retaliatory animus.

**75.** Defendant Foundation of Allen University (herein "Defendant Foundation") is a corporate entity affiliated with the University. At all times relevant, Defendant McNealey served as President of Defendant Foundation and exercised absolute administrative control over it. Defendant Foundation was utilized by the individual Defendants to hide, transfer, and benefit from diverted institutional funds and manipulated academic project accounts.

**76.** Defendant Pinckney Center Operations, LLC (herein "Defendant POC") is a South Carolina limited liability company. At all times relevant, Defendant McNealey served as President of Defendant POC, and Defendant Green served on its Board of

Managers. Defendant POC was integrated into the Enterprise infrastructure to orchestrate coordinated transactions, siphon university resources, and shield the individual Defendants' underlying mail and wire fraud schemes from internal faculty oversight.

**77.** Defendant Waverly Hospital Owner, LLC (herein "Waverly Owner") is a corporate shell entity utilized within the Enterprise structure. At all times relevant, Defendant Ernest McNealey served as its President and exercised absolute control over it. Defendant Waverly Owner was used to strip the University of its unencumbered ownership of the historic Waverly Building, transferring and encumbering the asset to generate outside financial benefits shielded from faculty and public oversight.

**78.** Defendant Waverly Hospital MM, LLC (herein "WHMM") is a corporate shell entity controlled by Defendant McNealey as President. Defendant WHMM participated directly in the hidden financing, leasing, and disposition of funds and contractual rights associated with Waverly and the Boeing Project.

**79.** Defendant Waverly Hospital MT, LLC (herein "WMT") is a corporate shell entity controlled by Defendant McNealey as President. Defendant WMT was utilized to manage, receive, and transfer funds and financial interests associated with the Waverly-Project infrastructure.

**80.** Plaintiff alleges that Defendant Foundation, Defendant POC, Defendant Waverly Owner, Defendant WHMM, and Defendant WMT were not independent actors. They operated as a unified, overlapping network of corporate shells headed exclusively by Defendant McNealey.

**81.** This multi-entity architecture allowed the individual Defendants to divert university property, financing proceeds, and contractual funds completely outside of ordinary financial and governance structures. This environment enabled systemic contract manipulation, financial concealment, and the eventual execution of wage theft and retaliatory termination against the Plaintiff when he internally opposed these hidden operational practices.

**82.** John Does 1–10 are currently unknown individuals, administrative staff, or agents who knowingly participated in, facilitated, or executed the pattern of unlawful conduct and retaliation targeting the Plaintiff.

**83.** Defendant Doe Corporations and Business Entities 1–10 are currently unknown business affiliates, corporate shells, or subsidiaries utilized by the individual Defendants to conceal, divert, or misappropriate funds or to facilitate the fraudulent scheme alleged herein; Plaintiff will seek leave to amend this pleading to name these entities specifically once their identities are revealed through discovery.

ATTACHMENT E

## IV. STATEMENT OF FACTS AND BACKGROUND

### A. The Governance Structure and the Influence of the Enterprise

**84.** The Plaintiff is a distinguished educator, a recipient of South Carolina's Outstanding Professor award, and an academic professional with over thirty (30) years of teaching and research experience in the fields of Humanities and Social Sciences.

**85.** The Plaintiff was actively employed as a faculty member at the University from August 2020 through the expiration of his contract term on May 13, 2026.

**86.** Defendant, The Board of Trustees of Allen University (herein as "BOT"), engaged the services of the Plaintiff as an active instructor tasked with administering academic course curricula, creating rigorous course syllabi, instructing enrolled college students, evaluating student performance, and submitting final academic marks within the strict deadlines established by the institutional calendar.

**87.** The Plaintiff's employment relationship with the Defendants was governed by an explicit, multi-layered compensation matrix comprising a guaranteed baseline monthly salary for primary instructional services.

**88.** This baseline compensation structure was routinely supplemented by separate, distinct, and independent contractual agreements executed for additional overload classes, concurrent adjunct instructional courses, and specialized academic committees, including the Waverly-Boeing Institute committee.

**89.** These supplementary overload contracts and adjunct course agreements required the Plaintiff to manage, instruct, and grade dense student enrollments during

complex, overlapping academic terms, thereby creating multiple independent, binding payment obligations for the Defendants.

**90.** The Plaintiff successfully, completely, and faithfully performed all material obligations required under his primary employment contract, concurrent overload agreements, committee appointments, and adjunct course instructions throughout the duration of his active service.

**91.** The University operates as a private educational institution located within the African Methodist Episcopal Church's ("AMEC") Seventh Episcopal District, creating a distinct, structural association-in-fact Enterprise under 18 U.S.C. § 1961(4). Historically and structurally, the presiding Bishop of the Seventh Episcopal District concurrently serves as the Chairman of Defendant Board, granting the individual holding that dual role supreme, unreviewable authority over institutional governance and personnel appointments.

**92.** During the periods relevant to this action, Defendants Green and Davis successively served as the Presiding Bishops of the Seventh Episcopal District and as Chairmen of Defendant Board.

**93.** In these overlapping capacities, Defendants Green and Davis exercised absolute operational control over both the fundraising mechanisms of the church district and the corporate governance infrastructure of the University Enterprise, steering institutional assets away from payroll obligations.

**94.** Individual members of Defendant BOT Green and former President McNealey exploited this structural overlap to consolidate administrative power, control financial disclosures, and systematically execute a pattern of racketeering activity by concealing

joint fiscal operations and suppressing independent oversight, constituting a continuous pattern of behavior mirroring the parallel patterns exposed in the *Montgomery* filing.

**95.** Plaintiff does not challenge the religious affiliation, cultural identity, or ecclesiastical doctrine of the University or the AMEC.

**96.** Rather, this action challenges the secular, individual misuse of corporate authority by the individually named Defendants within the Enterprise, specifically their intentional breach of fiduciary duties, their coordinated execution of unlawful employment retaliation, and their use of interstate wires to defraud the Plaintiff.

**97.** Despite the Plaintiff's full performance, the Defendants systematically failed to disburse his contractually earned compensation, initiating an intentional course of straight-time wage withholding.

**98.** The Defendants' scheme is part of an ongoing, institutionalized pattern of behavior, as evidenced by their parallel conduct in the matter of *Montgomery v. Allen University BOT*, and the recent grand jury wire fraud indictment, *USA v. Lamonica Valrie*, Case No. 3:26-cr-00749-CRI-1 on September 15, 2026.

**99.** At all times relevant to this action, the Defendants routinely and intentionally withheld and concealed the Plaintiff's donor funds and regular base salary payments, failing to compensate him for earned overload classes, committee and DJJ contracts, and concurrent adjunct courses, directly causing concrete, independent RICO injury to the Plaintiff, utilizing an identical or similar pattern of administrative concealment detailed in the *Montgomery* filing.

**100.** During the precise timeline that the Plaintiff's contractually earned wages were systematically withheld, the Plaintiff initiated a continuous chain of formal, urgent electronic mail communications addressed to the individual administrative leadership and executive officers via interstate wires.

**B. Background, Coordinated Scheme, and Pattern of Misconduct**

**101.** These written digital inquiries meticulously itemized the numerous payroll deficiencies, missing contract disbursements, and overlapping term payment failures, serving as formal notice to the administration.

**102.** The individual Defendants and institutional administrators deliberately ignored, suppressed, and stonewalled the Plaintiff's electronic mail inquiries. They utilized interstate wire communications to perpetuate their fraudulent scheme, refuse an accurate accounting, and block the release of withheld contractual funds as part of their coordinated predicate acts of mail and wire fraud.

**103.** At all times relevant, members of Defendant BOT, McNealey, Green, and successor Chairman Davis maintained absolute administrative authority and exercised exclusive operational control over all named Defendants within the institutional Enterprise (S.C. Code Ann. § 33-31-801(b)).

**104.** As the University's former President and member of Defendant BOT, McNealey was directly responsible for the institution's daily fiscal operations, personnel management, and executive administrative leadership. All major institutional records, especially those relating to financial allocations and payroll disbursements, required his explicit authorization and signature.

**105.** Defendant McNealey reported exclusively to Defendant Board until his executive contract was abruptly terminated in December 2025.

**106.** Defendant McNealey's tenure was characterized by systemic administrative deficiencies, including federal agency investigations, high employee turnover, adverse financial audits, prior staff lawsuit settlements, the pending civil racketeering action *Montgomery v. Allen University Board of Trustees*, and the interrelated September 15, 2026, federal grand jury wire fraud indictment in *USA v. Lamonica Valrie*.

**107.** The Defendants, acting in concert with the full knowledge of the named Defendant Board and Defendant McNealey, systematically denied the Plaintiff his contractually earned compensation and protected fiduciary funds throughout the 2020–2026 academic years.

**108.** On September 14, 2020, the Plaintiff began working as an Adjunct Professor for the Enterprise, teaching in the Department of Juvenile Justice ("DJJ") college program.

**109.** The Plaintiff's Fall 2020 contract mandated two specific, contractually guaranteed monthly payroll disbursements to be executed on September 14, 2020, and October 30, 2020.

**110.** Based on information and belief, Defendant McNealey authorized Defendants Muhammad (then Interim Vice President for Academic Affairs) and Dennis to materially breach the contract agreement by intentionally withholding the Plaintiff's contractually guaranteed payroll disbursements when due, utilizing methods of administrative concealment that directly parallel the institutional practices exposed in the *Montgomery* filing.

**111.** Following the Plaintiff's urgent electronic inquiries to Defendants McNealey, Muhammad, and Dennis, Defendant McNealey partially resolved the breach by distributing the September 14 paycheck on December 30, 2020, albeit significantly delayed, continuing a regular practice of unlawful wage retention.

**112.** During the Spring 2021 semester (January–May), the Plaintiff taught two concurrent academic classes for the DJJ program and two standard classes at the main campus.

**113.** Based on information and belief, Defendant McNealey instructed Defendants Muhammad and the then-HR Director to commit a secondary breach of contract by completely failing to disburse contractually earned wages for the four courses the Plaintiff taught, replicating the patterns of non-payment detailed in the *Montgomery* matter.

**114.** By the end of May 2021, Defendants McNealey and Muhammad had approved only a portion of the Plaintiff's contract, disbursing 75% of the total amount contractually mandated.

**115.** On July 12, 2021, the Plaintiff transferred to a full-time position as an Assistant Professor of History at the Enterprise.

**116.** Beginning August 8, 2021, the Plaintiff taught two separate, concurrent DJJ adjunct courses under supplementary agreements, providing additional instructional services.

**117.** Defendants McNealey, Muhammad, and Dennis withheld these adjunct funds until December 23, 2021, at which point they disbursed only one-fourth of the

contracted amount, utilizing a wage-withholding method identical to that exposed in the *Montgomery* civil racketeering filing.

**118.** During the Spring 2022 academic term, Plaintiff taught two additional DJJ adjunct courses; however, Defendant McNealey denied him his earned wages, instructing Muhammad and Dennis to conceal the remaining portion, which was part of their ongoing pattern of racketeering activity, as exposed in *Montgomery v. Allen University BOT.*

**119.** Following a series of formal, written wage disputes transmitted by the Plaintiff, Defendants McNealey, Muhammad, and Dennis partially compensated the Plaintiff on June 30, 2022, while continuing to withhold the remaining balance through a continuous course of administrative deception.

**120.** On August 8, 2022, Plaintiff transferred to a tenure-track Assistant English Professor position, an offer that Defendant Muhammad signed.

**121.** On April 18, 2023, South Carolina Independent Colleges and Universities ("SCICU") formally recognized the Plaintiff's academic excellence with the 2023 Excellence in Teaching Award and deposited a monetary award into the University's account in his honor.

**122.** On May 10, 2023, the Plaintiff submitted a formal digital request via interstate wires to access the award funds earmarked for him by the SCICU; however, Defendant McNealey and administrative leadership intentionally suppressed and ignored the transmission, utilizing a method of administrative concealment that directly replicates the pattern exposed in the *Montgomery* filing.

**123.** Despite mandatory medical rehabilitation, the Plaintiff successfully administered and taught his assigned academic course load electronically during the Fall 2023 semester (August to December 2023).

**124.** During the Summer 2024 academic term, Defendant McNealey rehired Defendant Spearen as Interim Provost and Vice President of Academic Affairs for the Enterprise, a position she previously held.

**125.** In August 2024, the Plaintiff discovered that Defendants McNealey and Spearen withheld compensation for his contractually earned overload pay from the South Carolina Department of Juvenile Justice ("DJJ") college program, mirroring the wage-withholding tactics exposed in the *Montgomery* civil racketeering filing.

**126.** In August 2024, the Plaintiff formally notified Defendants McNealey and Spearen via interstate wire of specific discrepancies in DJJ contracts and payroll.

**127.** Although Defendants McNealey and Spearen acknowledged the payroll discrepancies via electronic mail, Defendant McNealey subsequently withheld the full amount and denied disbursement of the Plaintiff's earned wages, executing a continuous pattern of non-payment consistent with the institutional behavior detailed in the *Montgomery* filing.

**128.** On November 27, 2024, Defendant McNealey sent an electronic communication via interstate wires instructing Defendant Spearen to disburse partial compensation of the DJJ grant funding to the Plaintiff, an action that closely tracks the administrative schemes exposed in the *Montgomery* filing.

**129.** On December 2, 2024, after the Plaintiff had already completed instructing the designated classes, Defendant McNealey instructed Defendant Spearen to modify and electronically mail the Plaintiff a revised contract, an act reflecting a continuous pattern of contract manipulation consistent with the practices exposed in the *Montgomery* filing.

**130.** On December 2, 2024, Defendant McNealey emailed Defendant Spearen, approving the business office's underpayment of the Plaintiff, an action that directly violated the original DJJ contract and federal grant funding, paralleling the fraudulent financial schemes exposed in the *Montgomery* filing.

**131.** From January to May 2025, the Plaintiff corresponded extensively with Defendant McNealey electronically regarding ongoing wage theft, and during this period, the Plaintiff submitted a detailed 20-page Employment Review package, which Defendant McNealey aggressively condensed to seven pages with a restrictive request.

**132.** On or around April 23, 2025, Defendant McNealey instructed Defendant Spearen to withhold compensation from the Plaintiff for instructional work fully performed under the donor-funded Waverly-Boeing Institute agreements spanning August 2024 through December 2025 and continuing into Spring 2026, a wage-withholding tactic identical to the corporate modus operandi exposed in the *Montgomery* civil racketeering filing.

**133.** In May 2025, during the annual employee contract renewal cycle, Defendant CS, at Defendant McNealey's demand, attempted to present Plaintiff with a deceptive contract that offered less compensation than in previous years and excluded the Waverly-Boeing Institute compensation, repeating the structural underpayment patterns exposed in the *Montgomery* filing.

**134.** From April to May 2025, the Plaintiff sent numerous electronic communications to Defendant McNealey protesting unaddressed payroll discrepancies, systemic financial mismanagement, and active wage theft within the Departments of Human Resources and Academic Affairs, which actions mirror the broader corporate failures exposed in the *Montgomery* filing.

**135.** On or around April 23, 2025, Plaintiff discovered an additional payroll discrepancy, revealing through his Human Resources records that on July 30, 2023, while he was recovering from a medical emergency, Defendant McNealey authorized Defendant Dennis to withhold his contracted pay, demonstrating an institutionalized pattern of bad-faith withholding consistent with the *Montgomery* filing.

**136.** In August 2025, Defendant McNealey rehired Defendant Muhammad as the permanent Provost, Vice President for Academic Affairs, and Chief Academic Officer of the Enterprise, a position she had previously held.

**137.** On August 19, 2025, the Plaintiff discovered that Defendants McNealey, Dennis, and Love had failed to remit his short-term and long-term disability insurance premiums to the third-party provider for over two years, despite continuously deducting those premiums from the Plaintiff's monthly paychecks, an unauthorized diversion of funds mirroring the financial misconduct exposed in the *Montgomery* civil racketeering filing.

**138.** On September 9, 2025, Defendants McNealey, Dennis, and Love admitted to premium diversion and made a partial payment, actively concealing the Plaintiff's right to file retroactive insurance claims to mask their structural breach of fiduciary duty, a course of conduct matching the deceptive schemes exposed in the *Montgomery* filing.

**139.** Following months of electronic inquiries and concrete evidence of negligence by Defendants McNealey, Dennis, and Love, the insurance carrier bypassed its standard 12-month policy limitation, allowing the Plaintiff to file retroactive disability claims in December 2025 and January 2026, two and a half years after the fact, exposing an institutional timeline of concealment similar to the schemes documented in the *Montgomery* filing.

**140.** For more than two years, Defendant McNealey and the successive Vice Presidents of Academic Affairs concealed from the Plaintiff the availability and release of his awarded SCICU grant funding, an administrative cover-up pattern directly mirroring the one detailed in the *Montgomery* filing.

**141.** Because Defendants McNealey, Muhammad, and others continuously refused to respond to the Plaintiff's 2023 and 2024 written SCICU grant funding requests, the Plaintiff transmitted a final series of urgent electronic demands between September 24 and October 6, 2025, which the Defendants completely suppressed and left unresolved, continuing the pattern of systemic administrative stonewalling documented in the *Montgomery* filing.

**142.** On November 11, 2025, Defendant Muhammad transmitted an email via interstate wires to the Plaintiff, denying the release of independent SCICU grant funding awarded to the Plaintiff on April 18, 2023, replicating the methods of administrative concealment detailed in the *Montgomery* case.

**143.** The digital denial highlighted a single, inapplicable portion of the grant requirements to construct a fraudulent pretext for the continued withholding of the

Plaintiff's award, a deceptive tactic matching the misconduct detailed in the *Montgomery* filings.

**144.** On November 12, 2025, the Plaintiff sent an electronic inquiry to the SCICU board via interstate wires to formally verify the funding criteria.

**145.** Based on information and belief, on November 12, 2025, the SCICU board intervened by electronically demanding that Defendant Muhammad immediately release the withheld grant funding to the Plaintiff, disrupting the pattern of unauthorized fund retention.

**146.** On December 2, 2025, Defendants McNealey and Muhammad issued an electronic communication admitting to a financial discrepancy involving the unauthorized withholding of the Plaintiff's grant funds, a wage-withholding method consistent with the operational practices exposed in the *Montgomery* civil racketeering filing.

**147.** On December 2, 2025, two years after the grant was originally awarded, Defendants Muhammad and McNealey partially remedied the violation by releasing two-thirds of the funding, but they continued to withhold the remaining balance, deploying a partial-payment scheme identical to that exposed in the *Montgomery* civil racketeering filing.

**148.** On February 2, 2026, the Plaintiff reported another payroll error and straight-time wage violation regarding his government-funded DJJ overload courses taught during the Fall 2025 semester, illustrating the ongoing nature of the Enterprise's underpayment practices.

**149.** On February 9, 2026, during a fall semester Faculty Meeting, Defendant Interim President Pritchett publicly acknowledged Plaintiff as "an outstanding professor and a beacon of hope for the students."

**150.** On February 12, 2026, Defendant Muhammad, with the permission of Defendants Pritchett and Davis, acknowledged the reported February 2 payroll error via electronic mail and instructed Defendant Dennis to compensate the Plaintiff by February 27, 2026, two and a half months past the contracted performance period, utilizing an administrative delay tactic parallel to the schemes exposed in the *Montgomery* filing.

**151.** For nearly a year, the Plaintiff unsuccessfully exhausted all available internal avenues in an attempt to resolve continuous, systemic wage disputes through the Enterprise's institutional complaint procedures, meeting the same administrative barriers exposed in the *Montgomery* filing.

**C. Plaintiff's Protected Whistleblowing and the Defendants' Coordinated Retaliation**

**152.** On March 5, 2026, Defendants Dennis and Robinson, in their capacities as HR Director and VP of Fiscal Affairs, advised the Plaintiff to initiate his formal pay dispute grievance by speaking with his immediate Department Chair.

**153.** In strict compliance with the Defendants' administrative directives, the Plaintiff met with the Department Chair on March 5, 2026, to formally detail his ongoing contract discrepancies, unremitted insurance benefits, and withheld compensation streams.

**154.** The Department Chair redirected the Plaintiff, instructing him to file a formal, escalated corporate grievance directly with Human Resources Defendant Dennis and Fiscal Affairs Defendant Robinson.

**155.** On March 11, 2026, in strict accordance with the mandatory procedures set forth in the University Faculty Handbook and institutional bylaws, the Plaintiff formally prepared an internal grievance to challenge the ongoing financial irregularities.

**156.** On March 12, 2026, the Plaintiff filed a formal, contractually protected written grievance with Defendants Dennis and Robinson, detailing ongoing financial violations, benefit fraud, and systemic governance non-compliance within the Enterprise, specifically identifying a pattern of bad-faith withholding identical to the practices exposed in the *Montgomery* civil racketeering filing.

**157.** On March 16, 2026, four days after the Plaintiff filed his formal written grievance, individual Defendants Muhammad, Dennis, and Robinson, with authorization from BOT Defendants Pritchett and Davis pursuant to administrative protocol, collectively launched an aggressive, coordinated campaign of employment retaliation.

**158.** On March 16, 2026, BOT Defendants Pritchett and Davis, acting with actual knowledge of and control over the Enterprise's operations, authorized and permitted Defendants Muhammad, Dennis, and Robinson to deploy retaliatory tactics against the Plaintiff, including locking his assigned classroom door, which physically prevented him from executing his core instructional duties, an incident unprecedented since he joined the University in 2020.

**159.** Later that same day, March 16, 2026, the Plaintiff received an administrative verbal reprimand and a formal written "Warning Letter" via electronic mail wrongfully

accusing him of classroom insubordination, an adverse action taken with the explicit knowledge, approval, or ratification of BOT Defendants Pritchett and Davis.

**160.** This retaliatory digital "Warning Letter" was carbon-copied directly to superior institutional officers, including the Division Dean and Defendant Muhammad, to construct a fraudulent paper trail to damage the Plaintiff's employment status and justify future adverse actions.

**161.** Based on information and belief, on March 19, 2026, individual Defendants Dennis and Robinson, acting at the direction of Defendant Muhammad, transmitted an electronic communication to the Plaintiff informing him that his formal protected grievance had been summarily declined and all internal administrative investigations had ceased.

**162.** Based on information and belief, Defendant Muhammad authorized Defendants Dennis and Robinson to abruptly terminate the Plaintiff's contractually protected right to a fair, objective, and impartial corporate grievance investigation, a right explicitly guaranteed by the University's Faculty Handbook and bylaws.

**163.** On March 23, 2026, during a formal faculty assembly, Defendant Muhammad publicly made slanderous, false, and disparaging remarks about the Plaintiff's academic department and professional field of study, directly attacking his professional discipline.

**164.** During that same faculty assembly on March 23, 2026, Defendant Muhammad publicly characterized the Plaintiff's academic department as a disgrace and openly admitted to the faculty assembly that she had actively encouraged students to write negative comments on instructors' formal evaluations to undermine their employment security.

**165.** On March 23, 2026, four days after the Plaintiff's protected whistleblowing disclosures, Defendants Dennis and Muhammad transmitted a formal notice of contract non-renewal to the Plaintiff via interstate wires. This adverse employment action was taken with the authorization or subsequent ratification of BOT Defendants Pritchett and Davis pursuant to administrative protocol, occurring a mere six weeks after BOT Defendant Pritchett, the University Interim President, had publicly praised the Plaintiff as a "beacon of hope" for the student body.

**166.** The Plaintiff alleges that this rapid, punitive, and adverse administrative timeline was arbitrary, capricious, and executed in direct violation of the University's operational statutes, reflecting methods of employment retaliation that directly parallel the schemes exposed in the *Montgomery* filing.

**167.** Based upon information and belief, this non-renewal was a retaliatory execution designed to silence the Plaintiff, neutralize him as a source of internal oversight, and protect the individual Defendants' ongoing racketeering Enterprise from public exposure, mirroring the continuous patterns of behavior exposed in the *Montgomery* filing.

**168.** BOT Defendants Pritchett and Davis acted with actual knowledge or deliberate indifference when, on April 10, 2026, Defendants Muhammad, Dennis, and Robinson transmitted a digital cease-and-desist demand to the Plaintiff and others containing demonstrably false allegations and defamatory stereotypes designed to intimidate the Plaintiff, tracking a continuous pattern of administrative intimidation detailed in the *Montgomery* filing.

**169.** On April 12, 2026, the Plaintiff transmitted a formal, written electronic rebuttal to Defendant Muhammad's defamatory communications, rejecting the pretextual allegations.

**170.** On April 13, 2026, Defendant Muhammad scheduled an administrative meeting for April 22, 2026, to be attended by the Plaintiff, the Division Dean, Defendant Dennis, and Defendant Muhammad, of which meeting BOT Defendant Pritchett had explicit knowledge.

**171.** On April 21, 2026, Defendant Muhammad refused to provide the Plaintiff with a complete copy of his formal personnel and payroll records for the scheduled administrative meeting, actively concealing material evidence of their ongoing wage cover-up.

**172.** On April 22, 2026, Defendant Muhammad abruptly canceled the scheduled administrative meeting regarding the ongoing wage theft, breach of fiduciary duty, and contract breaches without cause or rescheduling.

**173.** On April 22, 2026, Plaintiff filed a counterclaim against Defendant Muhammad, the Vice Provost for Academic Affairs, with University Interim President Defendant Pritchet, alleging false allegations, harassment, and retaliation; however, Defendant Pritchet did not respond until Plaintiff's last day of employment, May 13, 2026, leaving the matter unresolved and replicating the pattern of executive inaction illustrated in the *Montgomery* filing.

**174.** On May 13, 2026, the Plaintiff's last day of employment, BOT Defendant Interim President Pritchett met personally with the Plaintiff to hear his report regarding the ongoing campaign of retaliation, structural defamation, and false administrative

statements perpetrated by Defendants Muhammad, Dennis, and Robinson; however, Defendant Pritchett failed to comment or intervene, replicating the pattern of executive inaction illustrated in the *Montgomery* filing.

**175.** Members of Defendant BOT, McNealey, Davis, and Pritchett had actual knowledge of Defendant Muhammad's abuse of executive authority, and severe financial mismanagement within the institution, yet they failed to intervene or execute their mandatory fiduciary oversight duties, a continuous pattern of governance failure also illustrated in the *Montgomery* filing.

**176.** The continuous acts of financial deception, systemic wage withholding, disability premium diversion, and administrative retaliation detailed throughout this Complaint did not constitute isolated or sporadic occurrences.

**177.** Rather, these acts formed a continuous, coordinated, and institutionalized course of conduct specifically designed to avoid financial accountability, suppress internal grievances, and unlawfully deprive the Plaintiff of earned compensation, thereby establishing a pattern of racketeering activity under 18 U.S.C. § 1962, consistent with the institutional practices exposed in the *Montgomery* filing.

**D. The Fraudulent Operational Scheme as Motive for Retaliation**

**178.** The individual Defendants leveraged their combined institutional authority to execute a continuous pattern of financial deception, which included the fraudulent withholding of insurance premiums, the misuse of federal grant funds, the misappropriation of donor funding, and the unauthorized manipulation of academic contracts, as evidenced by their parallel misconduct in the matter of *Montgomery v.*

*Allen University* BOT and the recent grand jury wire fraud indictment, *USA v. Lamonica Valrie.*

**179.** This underlying pattern of wire fraud and fiscal concealment required absolute silence from the University faculty members to prevent public, statutory, and regulatory exposure of the individual Defendants' personal enrichment and capital diversion schemes, in a manner identical to the operational environment exposed in the *Montgomery* filing.

**180.** As a direct participant in the University's academic operations, the Plaintiff became aware of operational misconduct and internally challenged specific elements of this fraudulent environment, including:

a. The fraudulent mismanagement and submission of misleading information regarding federal grant funds and unremitted insurance premium deductions;

b. The unauthorized manipulation and diversion of institutional and third-party donor funding allocations; and

c. Pervasive contract manipulation and systemic straight-time wage theft directly affecting faculty compensation.

**181.** Individual members of Defendant BOT, McNealey, Green, Davis, and the remaining administrative Defendants operated as a unified, controlling majority within the Enterprise infrastructure to actively suppress, stall, and stonewall any internal inquiry into these severe fiscal discrepancies.

**182.** The Plaintiff alleges that the individual Defendants' collaborative abuse of corporate authority was the direct and proximate cause of his severe professional marginalization and eventual retaliatory non-renewal of his employment contract.

**E. Institutional Notice and the Continuity of the Racketeering Scheme**

**183.** BOT Defendants Green and Davis maintained dual operational roles as both corporate executives of the University Enterprise and high-ranking officials within the African Methodist Episcopal Church ("AMEC") corporate hierarchy and its Council of Bishops.

**184.** The AMEC corporate infrastructure and its Council of Bishops possessed explicit, prior institutional knowledge of the fraudulent financial tendencies of Defendants Green and Davis due to their direct involvement and subsequent multi-million-dollar settlements in the federal multi-district retirement plan litigation, In re: AME Church Employee Retirement Fund Litigation, No. 1:22-md-03035-STA-jay (W.D. Tenn.).

**185.** Through the concurrent litigation in *Montgomery v. Allen University Board of Trustees,* et al., Case No. 3:26-cv-01157 (D.S.C.), active federal investigations, and internal reports, the AMEC corporate leadership and the Council of Bishops received formal, written notice that members of Defendant BOT, Green, Davis, and McNealey were utilizing unchecked administrative authority to perpetrate systemic financial fraud, contract manipulation, and severe whistleblower retaliation within the University Enterprise.

**186.** Despite receiving explicit notice of this ongoing pattern of wire fraud, mail fraud, and unlawful employment practices, the AMEC corporate leadership and the Council of Bishops knowingly failed to execute their corporate oversight duties, rescind the

administrative credentials of the individual Defendants, or mandate an independent financial audit.

**187.** The Plaintiff alleges that this deliberate institutional inaction by the corporate church entities provided the necessary administrative cover-up that enabled members of Defendant BOT, Green, Davis, and McNealey to maintain absolute control over the University Enterprise, enabling them to continue their fraudulent schemes unabated and execute the retaliatory termination of the Plaintiff's employment.

**F. The Resulting Economic Harm and Basis for This Action**

**188.** As a direct and proximate result of the individual Defendants' fraudulent schemes, concerted retaliation, and unlawful contract non-renewal, the Plaintiff has suffered substantial, concrete financial damages, including the loss of employment wages, academic benefits, and the severe impairment of his professional earning capacity.

**189.** The Plaintiff has suffered quantifiable economic harm to his professional standing, career infrastructure, and academic reputation due to the defamatory and retaliatory mechanisms executed by the Defendants to force his silence, constituting a continuous pattern of behavior mirroring the parallel patterns exposed in the *Montgomery* filing.

**190.** The Plaintiff brings this independent civil action strictly in his individual capacity to redress these direct financial and property injuries inflicted upon him by the individual persons who hijacked the corporate infrastructure of the University Enterprise.

**191.** The Plaintiff alleges that the individual Defendants' continuous pattern of behavior directly violates the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), and forms the basis for concurrent state-law claims of statutory retaliation, breach of contract, and intentional tortious misconduct.

**192.** The Plaintiff seeks to hold the individual named Defendants personally liable for their fraudulent and retaliatory misconduct, and requests all available legal and equitable relief, including compensatory damages, statutory treble damages pursuant to 18 U.S.C. § 1964(c), and punitive damages under applicable laws.

**G. Consequential Financial and Personal Harm to Plaintiff**

**193.** As a direct and proximate result of the Defendants' systematic, bad faith withholding of the Plaintiff's earned regular wages, base salary, and overload and adjunct contract compensation, the Plaintiff was thrust into immediate, severe financial destitution that systematically dismantled his entire financial estate and standard of living.

**194.** Because the Defendants intentionally deprived the Plaintiff of his liquid contractual income and ignored his explicit electronic mail inquiries, the Plaintiff was stripped of the baseline ability to meet his fundamental monthly financial obligations.

**195.** This catastrophic income deprivation directly forced the Plaintiff to consolidate his credit card debt under highly unfavorable terms and led to the immediate, non-voluntary liquidation and permanent loss of his Fidelity 401K, TIAA retirement, and savings accounts.

**196.** Furthermore, the Defendants' severe withholding of funds completely compromised the Plaintiff's ability to maintain basic insurance protections, directly resulting in the cancellation and total loss of three individual life insurance policies, his employer-sponsored life insurance policy, and his automobile insurance policy.

**197.** Most catastrophically, the Defendants' forced deprivation of the Plaintiff's income directly caused his apartment rental property insurance policy to lapse for non-payment immediately prior to an unpredictable, devastating apartment complex fire.

**198.** Because the Defendants' actions caused this critical policy lapse, the Plaintiff was left completely exposed and uncompensated for the total loss of his personal property, the forced non-renewal of his primary residential lease, and the continue destruction of his standard of living.

**199.** The compounded economic devastation from the Defendants' multi-year scheme also exacted an extreme physical and medical fiscal toll on the Plaintiff.

**200.** Following this financial deprivation, the Plaintiff incurred substantial out-of-pocket medical expenses and burdensome travel expenses to secure vital care from medical specialists and undergo out-of-town medical procedures.

**201.** The financial fallout completely destroyed the Plaintiff's pristine credit score, dragging it from a Tier-1 rating of 820 down to a ruined score of 450, which triggered the subsequent failure of related administrative claims two years later and permanently impaired his borrowing capacity.

**202.** Given the Plaintiff's advancing age, the severe impact of soon turning sixty-six (66), the total loss of potential employment within the institution, and the permanent

disruption of his 30-year career trajectory, the Plaintiff has suffered permanent, irreversible losses in future wages and earning capacity for which the Defendants are entirely liable.

**203.** The precise structure, participants, and operational methods of the Defendants' fraudulent scheme and predicate acts are more fully set forth in the sequential counts below/attached.

**ATTACHMENT F**

## CAUSE OF ACTION

## COUNT I: CIVIL RICO

**(Violation of 18 U.S.C. § 1962(c) – Against All Individual Defendants in Their Individual Capacities)**

**204.** Plaintiff realleges and incorporates by reference paragraphs 1 through 203 of this Complaint, and any paragraphs in prior counts, as if fully set forth and repeated verbatim under this Count I, (**Civil RICO).**

**205.** At all times relevant, the Institutional Entities (**Board of Trustees et al.**, **Church Inc.**, and **Council of Bishops**) constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4). This enterprise engaged in, and its activities affected, interstate commerce.

**206.** The individual Defendants (including the past and present Presidents, Vice Presidents, and HR Director) were employed by or associated with the enterprise. They intentionally concealed, conducted and participated in the conduct of the enterprise's affairs through a **"pattern of racketeering activity"** under 18 U.S.C. § 1961(5).

**207.** This pattern consisted of at least two related and continuous predicate acts of **Federal Wire Fraud (18 U.S.C. § 1343)** and **State-Law Financial Coercion/Extortion**. The Defendants utilized interstate electronic mail networks and payroll routing systems to transmit deceptive contracts, withhold earned wages, and divert short-term (STD) and long-term (LTD) disability insurance premiums over a continuous period exceeding two years.

**208.** As a direct and proximate result of the Defendants' racketeering activity, enterprise coordination, and violations of 18 U.S.C. § 1962(c), Plaintiff has suffered concrete, quantifiable, and severe injuries to business and property. These injuries include, but are not limited to, the loss of regular and overload wages, the unlawful withholding of SCICU funding, and the loss of insurance benefits. Accordingly, Plaintiff is entitled to judgment against the Defendants, jointly and severally, for threefold the actual damages sustained, plus reasonable litigation costs and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**209.** The Enterprise's pattern of racketeering activity directly interfered with and undermined Plaintiff's ongoing employment contracts and compensation structures.

## COUNT II: BREACH OF CONTRACT & IMPLIED COVENANT

### (Against Defendant Board of Trustees et al.)

**210.** Plaintiff realleges and incorporates by reference paragraphs 1 through 209 of this Complaint, and any paragraphs in prior counts, as if fully set forth and repeated verbatim under this Count II, (**Breach of Contract & Implied Covenant**).

**211.** Plaintiff and Defendant Board of Trustees et al. entered into valid, binding employment and institutional agreements, including the Annual Faculty Contract, the Boeing Institute agreements, and the DJJ Spring adjunct agreement.

**212.** Defendant breached these express contracts by failing to pay contractual regular and overload wages, refusing to honor Boeing Institute staff funds, withholding SCICU donor funds, and failing to adhere to the mandatory, contractually binding institutional grievance procedures outlined in the Faculty Handbook.

**213.** Furthermore, Defendant breached the **Implied Covenant of Good Faith and Fair Dealing** by intentionally canceling scheduled meetings, locking classroom doors to hinder Plaintiff's ability to teach, and executing a pretextual non-renewal to evade its financial accountabilities.

**214.** As a direct and proximate result of these breaches, Plaintiff has suffered significant economic damages, including lost salary, benefits, and back pay.

**215.** As a direct and proximate result of Defendant Board of Trustees et al.'s material breaches of express contracts and violations of the Implied Covenant of Good Faith and Fair Dealing, Plaintiff has sustained significant economic damages, lost salary, and denied contract benefits. Defendant's intentional actions have deprived Plaintiff of the fruits of the bargained-for agreements, rendering Defendant liable for full compensatory damages, back pay, and interest in an amount to be determined at trial.

**COUNT III: WAGE THEFT / VIOLATION OF THE SOUTH CAROLINA WAGE PAYMENT ACT**

**(S.C. Code Ann. § 41-10-10 et seq. – Against All Defendants)**

**216.** Plaintiff realleges and incorporates by reference paragraphs 1 through 215 of this Complaint, and any paragraphs in prior counts, as if fully set forth and repeated verbatim under this Count III, (**Wage Theft**.)

**217.** At all relevant times, Defendants were "employers" and Plaintiff was an "employee" under South Carolina law.

**218.** Defendants violated **S.C. Code Ann. § 41-10-40** and § 41-10-50 by failing to pay Plaintiff all wages due, including regular payroll for July 2023, overload pay, and

contractual adjunct compensation, and by withholding those funds for over two years without legal justification.

**219.** Defendants further violated the Act by deducting Short-Term Disability (STD) and Long-Term Disability (LTD) premiums from Plaintiff's paychecks for two years while failing to remit those funds to the insurance carriers or properly account for them.

**220.** As a direct and proximate result of Defendants' willful and unlawful concealment of wages, regular payroll, and unremitted insurance premiums, Plaintiff has suffered direct financial deprivation in violation of South Carolina law. Because Defendants' withholding was intentional and not the result of a bona fide dispute, Plaintiff is entitled to a judgment against Defendants for an amount equal to three times the full amount of the unpaid wages, together with reasonable costs and attorney's fees as mandated by S.C. Code Ann. § 41-10-80.

**221.** Defendants' unauthorized and deceptive cover-up of these payroll deductions and earned compensation directly constitutes a conversion of Plaintiff's personal property.

**COUNT IV: CIVIL CONVERSION & BREACH OF FIDUCIARY DUTY**

**(Against All Defendants)**

**222.** Plaintiff realleges and incorporates by reference paragraphs 1 through 221 of this Complaint, and any paragraphs in prior counts, as if fully set forth and repeated verbatim under this **Count IV (Civil Conversion).**

**223.** Plaintiff had a definitive, immediate right to ownership and possession of specific, identifiable funds, including earned July 2023 wages, DJJ adjunct pay, SCICU donor

funds held for 2½ years, and deducted disability insurance premiums and claims denied for two years.

**224.** Defendants assumed a fiduciary duty when they deducted disability premiums directly from Plaintiff's salary. They breached this duty by mismanaging and withholding those funds, directly causing the two-year erroneous denial of Plaintiff's insurance claims.

**225.** Defendants intentionally, wrongfully, and without authorization exerted ownership and dominion over these specific funds, converting them to the institution's own use and benefit to avoid financial accountabilities.

**226.** As a direct and proximate result of Defendants' wrongful conversion and breach of fiduciary obligations regarding the deducted premiums and donor funds, Plaintiff has suffered the loss of use of personal property, severe financial hardship, and the erroneous denial of critical insurance coverage. Defendants' unauthorized exercise of dominion over Plaintiff's identifiable funds constitutes an intentional tort, rendering Defendants liable to Plaintiff for actual, consequential, and punitive damages.

**COUNT V: DEFAMATION PER SE**

**(Individual Claim by Plaintiff Against Defendants Muhammad, Dennis, and Robinson)**

**227.** Plaintiff, individually, repeats and realleges the preceding allegations concerning the false and disparaging statements made about him, the circumstances in which those statements were made, the persons to whom they were communicated, and the resulting harm to his reputation, as if fully set forth herein.

### A. False Statements Concerning Plaintiff

**228.** Defendants Muhammad, Dennis, and Robinson made false statements about Plaintiff's conduct as a faculty member at the University, regarding his efforts while fulfilling his duty and exercising his right to recourse.

**229.** On April 10, 2026, Defendants Muhammad, Dennis, and Robinson sent the Plaintiff a digital cease-and-desist demand, which was a pretext containing demonstrably false allegations and defamatory stereotypes designed to intimidate him into abandoning his investigation and to professionally slander him, continuing a pattern of administrative intimidation detailed in the *Montgomery* filing.

**230.** As alleged more particularly herein, Defendants Muhammad, Dennis, and Robinson falsely accused Plaintiff of misconduct, specifically sending several emails that disrupted Defendants Dennis and Robinson's daily work, impacted their feelings of safety, and constituted harassment and workplace bullying, further stating that any failure to adhere to the cease-and-desist content would lead to the Plaintiff's immediate termination.

### B. Publication to Others

**231.** Defendants Muhammad, Davis, and Robinson made or communicated the statements described above in electronic mailings to and from each other and to Defendant Pritchett, thereby publishing the statements to persons other than Plaintiff.

### C. Falsity and Knowledge

**232.** The statements by Defendant Muhammad, Dennis, and Robinson concerning Plaintiff were false.

**233.** After Defendants Muhammad, Dennis, and Robinson accused Plaintiff of serious, career-ending allegations, Plaintiff responded with an email to Defendants Muhammad and Pritchett, refuting the false allegations in the cease-and-desist letter.

**234.** Defendant Muhammad replied to Plaintiff's rebuttal by scheduling an administrative meeting with HR, Defendant Dennis, and Plaintiff's Division Dean.

**235.** In preparation for the administrative meeting, Plaintiff requested personnel files, but Defendant Muhammad denied the request, and the administrative meeting was subsequently canceled without cause or rescheduling.

**D. Fault, Malice, and Purpose**

**236.** Plaintiff alleges that Defendants Muhammad, Dennis, and Robinson made the statements attributed to him knowing they were false or with reckless disregard for whether they were true.

**237.** Plaintiff further alleges that these statements were a pretext to not only discredit him and terminate his contract, but also to obstruct and interfere with any further grievance investigations and with the compensation owed to him for years of direct wrongful actions and harm.

**E. Injury to Plaintiff**

**238.** Plaintiff alleges that the false statements harmed his reputation, credibility, and standing among colleagues, student body, and future employers.

**239.** As a direct and proximate result of the defamatory statements, Plaintiff suffered humiliation, emotional distress, and other damages recoverable under South Carolina law.

**ATTACHMENT G**

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in their favor and against all Defendants, jointly and severally, and grant the following forms of relief:

**A. Special and Economic Damages (The Base Losses)**

**240.** Unpaid Compensation: Award Plaintiff all contractually earned but withheld regular payroll for July 2023, baseline salaries, unpaid overload contracts, and unpaid adjunct instructional wages for the DJJ contract, plus pre-judgment and post-judgment interest at the maximum statutory rate;

**241.** Diverted and Misappropriated Funds: Award Plaintiff all misappropriated donor funds from the SCICU held unlawfully by the institution for 2½ years, and all funds contractually allocated under the Waverly-Boeing Institute contracts;

**242.** Denied Insurance Benefits: Award Plaintiff the full financial value of the Short-Term Disability (STD) and Long-Term Disability (LTD) benefits that were erroneously denied due to Defendants' financial mismanagement, bad-faith concealment, and premium withholding;

**243.** Consequential Financial Losses: Award Plaintiff full compensatory and consequential damages for documented catastrophic financial harm directly caused by the Defendants' wage-withholding schemes, including the forced liquidation of his Fidelity 401K and TIAA retirement accounts, the cancellation of his life and auto insurance policies, permanent credit rating destruction, and residential housing displacement losses resulting from the forced property insurance lapse.

**B. Statutory Damages, Multipliers, and Punitive Remedies**

**244.** Civil RICO Treble Damages (Count I): Enter an order tripling all actual economic, consequential, and property damages sustained by the Plaintiff as a direct result of Defendants' pattern of racketeering activity, pursuant to 18 U.S.C. § 1964(c);

**245.** FLSA Liquidated Damages (Count II): Award an equal amount in mandatory liquidated damages (double damages) for all unpaid straight-time compensation and wages pursuant to 29 U.S.C. § 216(b) due to the Defendants' willful statutory violations;

**246.** State Statutory Penalties (Count III): Award statutory liquidated damages, treble damages, and penalties for willful wage theft as authorized under the South Carolina Wage Payment Act (S.C. Code Ann. § 41-10-80);

**247.** Punitive Damages: Award Punitive Damages in an amount to be determined at trial to punish the Defendants for their egregious, willful, and malicious institutional conduct, and to deter such illegal behavior in the future.

**C. Equitable and Injunctive Relief (The Non-Monetary Demands)**

**248.** Personnel Records: Issue a mandatory injunction ordering Defendants to immediately release and provide complete, unredacted copies of all Plaintiff's requested personnel, employment, and payroll files;

**249.** Expungement: Order the complete removal, deletion, and expungement of the concocted digital cease-and-desist letters, false administrative allegations, and any retaliatory reprimands from Plaintiff's official personnel records.

**250.** Pursuant to 31 U.S.C. § 3730(h)(2), Plaintiff is entitled to all relief necessary to make him whole, including reinstatement, together with all other relief authorized by statute.

**251.** Plaintiff therefore seeks immediate reinstatement to the University, restoring him to the position, status, rights, authority, and term of service he would have possessed but for Defendants' retaliatory conduct.

**D. Fees and Costs**

**252.** Litigation Fees & Costs: Award Plaintiff all reasonable out-of-pocket costs, filing fees, investigator fees, and expenses incurred by the Plaintiff in maintaining and prosecuting this pro se action, as well as reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c) should Plaintiff retain counsel;

**253.** General Relief: Award Plaintiff such other, further, general, or alternative relief as this Court deems just, equitable, and proper under the circumstances.

**JURY DEMAND**

Plaintiff, individually and on behalf of himself, demands a trial by jury on all claims and issues so triable.

Dated: October 5, 2026

Respectfully Submitted,

Edroy "Eddie" Yancey, Plaintiff Pro Se
1110 Graham Rock Lane, Apt.104
Duncan, South Carolina 29334
901-517-7058
Eyancey12@gmail.com

**VERIFICATION OF PLAINTIFF EDROY "EDDIE" YANCEY**

I, Edroy "Eddie" Yancey, declares as follows:

I am the Plaintiff pro se in this action.

I have read the foregoing Verified Civil Complaint and know the contents thereof. The facts stated in the Complaint are true and correct to the best of my personal knowledge, information, and belief.

I make this Verification pursuant to **Federal Rule of Civil Procedure 23.1.**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 5th day of October 2026 in Duncan, South Carolina.

Edroy "Eddie" Yancey

Plaintiff, Pro Se